UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Nos. 08 Civ. 10571 (RJS), 08 Civ. 10572 (RJS), 08 Civ. 10573 (RJS), 08 Civ. 10574 (RJS), 08 Civ. 10582 (RJS), 08 Civ. 10583 (RJS)

_____

JP MORGAN CHASE BANK, N.A.,

Plaintiff,

VERSUS

COLEMAN-TOLL LIMITED PARTNERSHIP and TOLL BROTHERS, INC., *et al.*,

Defendants.

_____

MEMORANDUM AND ORDER
May 26, 2009

_____

RICHARD J. SULLIVAN, District Judge:

On December 5, 2008, JP Morgan Chase Bank, N.A. ("Plaintiff") filed a total of fourteen related actions in two separate federal district courts, all of which arise out of a failed real estate development project in Henderson, Nevada. Specifically, Plaintiff filed seven nearly identical complaints in the Southern District of New York (the "New York Actions"), and seven additional lawsuits raising different claims — naming the same seven sets of Defendants in seven nearly identical pleadings — in the District of Nevada (the "Nevada Actions").[1]

---

[1] The seven Nevada Actions are: *JP Morgan Chase Bank, N.A. v. Focus Group South, LLC & John A. Ritter*, No. 08 Civ. 1709 (PMP), *JP Morgan Chase Bank, N.A. v. KB Home & KB Home Nevada, Inc.*, No. 08 Civ. 1711 (PMP), *JP Morgan Chase Bank, N.A. v. Coleman-Toll Limited Partnership & Toll Brothers, Inc.*, No. 08 Civ. 1713 (PMP), *JP Morgan Chase Bank, N.A. v. Alameda Investments LLC*, No. 08 Civ. 1714 (PMP), *JP Morgan Chase Bank, N.A. v. Beazer Homes Holding Corp. & Beazer Homes USA, Inc.*, No. 08 Civ. 1715 (PMP), *JP Morgan Chase Bank, N.A. v. Pardee Homes of Nevada & Weyerhaeuser Real Estate Co.*, No. 08 Civ. 1716 (PMP), and *JP Morgan Chase Bank, N.A. v. Meritage Homes of Nevada, Inc., f/k/a MTH-*

Before the Court is a consolidated motion to transfer venue pursuant to 28 U.S.C. § 1404(a), which was filed by Defendants in five of the six above-captioned actions (collectively, "Moving Defendants" or "Defendants").[2] For the reasons set forth below, Defendants' motion is granted.

I. BACKGROUND

The background provided herein is taken from the complaints in the New York and Nevada Actions, and the declarations submitted by the parties. The Court describes only the facts and allegations that are relevant to the resolution of Defendants' motion.

A. Facts

The parties' dispute relates to "Inspirada," a real estate development project on a 1,940-acre plot of land in Henderson, Nevada. (NY Compl. ¶ 2.)[3] As it was originally conceptualized, Inspirada was to be a $1.25 billion "new urbanism" development that would include 11,500 residences. (*Id.* ¶ 11.) However, according to Plaintiff, "work on the Inspirada Project has substantially stalled, if not ceased completely." (*Id.* ¶ 39.) Predictably, this litigation followed.

1. The Parties

Plaintiff is a nationally chartered bank with its "main office" in Ohio (*id.* ¶ 8), and its "principal place of business" in New York, New York (McDonagh Decl. ¶ 3). Plaintiff brings the New York Actions as the administrative agent of a syndicate of lenders that provided financing for the Inspirada project (the "Lenders"). (NY Compl. ¶¶ 1, 8.) In the Nevada Actions, Plaintiff seeks to stand in the shoes of South Edge LLC ("South Edge"), the entity that borrowed funds from the Lenders. (NV Compl. ¶ 12.)

Non-party South Edge was created by a group of real estate development firms for the purpose of completing the Inspirada project. (*Id.* ¶¶ 2, 8.) South Edge is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada. (*Id.* ¶ 7.) South Edge retained Holdings Manager, LLC ("Holdings Manager"), which is also a Nevada limited liability company, as its general manger. (McGibney Decl. ¶ 7.)

---

*Homes Nevada, Inc., & Meritage Homes Corp.*, No. 08 Civ. 1717 (PMP). These actions have been consolidated before the Honorable Philip M. Pro, District Judge.

[2] In addition to the six above-captioned matters, there is one additional New York Action pending before this Court: *JP Morgan Chase Bank, N.A. v. Alameda Investments LLC*, No. 08 Civ. 10570 (RJS). Plaintiff reports that Defendant Alameda Investments, LLC filed for bankruptcy after Plaintiff filed claims against it. (*See* Pl.'s Mem. at 14 n.10.) As discussed in more detail below, Defendants in *JP Morgan Chase Bank, N.A. v. Focus Group South, LLC & John A. Ritter*, No. 08 Civ. 10573 (RJS), oppose the sought-after venue transfer. Therefore, the Court refers to Focus Group South, LLC, John A. Ritter, and Alameda Investments LLC collectively as the "Non-Moving Defendants." The Court refers to Defendants in the actions docked as Nos. 08 Civ. 10571 (RJS), 08 Civ. 10572 (RJS), 08 Civ. 10574 (RJS), 08 Civ. 10582 (RJS), and 08 Civ. 10583 (RJS) as "Defendants" or the "Moving Defendants."

[3] "NY Compl." refers to the Complaint from *JP Morgan Chase Bank, N.A. v. Coleman-Toll Limited Partnership & Toll Brothers, Inc.*, No. 08 Civ. 10571 (RJS). (Juman Decl. Ex. 5.) "NV Compl." refers to the Complaint from *JP Morgan Chase Bank, N.A. v. Coleman-Toll Limited Partnership & Toll Brothers, Inc.*, No. 08 Civ. 1713 (PMP). (*Id.* Ex. 11.) As noted by Plaintiff, the seven Complaints in the respective New York and Nevada Actions are the same in all relevant respects for the purposes of resolving Defendants' motion. (*See* Pl.'s Mem. at 1 n.1.)

2

Holdings Manager's employees are located in Nevada and perform "administrative and other tasks" for South Edge. (*Id.*)

South Edge was formed pursuant to an Operating Agreement between eight real estate development firms: Coleman-Toll Limited Partnership; KB Home Nevada Inc.; Pardee Homes of Nevada; Meritage Homes of Nevada, Inc.; Beazer Homes Holdings Corp.; Focus South Group, LLC; Alameda Investments, LLC; and Kimball Hill Homes (collectively, the "South Edge Members"). (NY Compl. ¶ 2 & n.1.)

Each of the South Edge Members was a subsidiary of a separate parent entity. (*Id.* ¶ 2.) The respective parents of the South Edge Members are: Toll Brothers, Inc.; KB Home; Weyerhaeuser Real Estate Company; Meritage Homes Corporation; Beazer Homes USA, Inc.; John A. Ritter; Woodside Group, Inc.; and Kimball Hill Inc. (collectively, the "South Edge Parents" or "Parents"). (*Id.* ¶ 2 & n.2.) Moving Defendants are the first five of the above-listed South Edge Member subsidiaries and their respective Parents.[4] Collectively, Defendants are located in Arizona, California, Georgia, Nevada, Pennsylvania, and Washington. (Cooper Decl. ¶ 1; Allred Decl. ¶ 1; Stocks Decl. ¶ 3; Helfrich Decl. ¶¶ 5-6; June Decl. ¶ 1.)

2. The Initiation of the Inspirada Project

On May 3, 2003, the South Edge Members entered into an Operating Agreement in order to form South Edge. (NV Compl. ¶ 23; *see also* Juman Decl. Ex. 2(B) (the "Operating Agreement").) The Operating Agreement provides that "[t]he laws of the State of Nevada (without giving effect to the conflicts of laws principles thereof) shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder." (Operating Agreement § 15.9, at 59.)

The Operating Agreement further states that "each [South Edge Member] . . . agrees that any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted exclusively in Nevada State Court, County of Clark, or in the United States District Court for the District of Nevada . . . ." (*Id.* § 15.9, at 60.)

In May 2004, South Edge agreed to purchase the land for the Inspirada project from the United States Bureau of Land Management for approximately $557 million. (NY Compl. ¶ 12.) South Edge and the South Edge Members subsequently entered into a series of agreements in which Plaintiff and the Lenders agreed to provide financing for the project through loans of up to $535 million. (*Id.* ¶ 15.)

On October 24, 2004, the South Edge Members entered into an Acquisition Agreement with South Edge. (NV Compl. ¶ 24; *see also* NY Compl. ¶¶ 13, 15; Juman Decl. Ex. 2(C) (the "Acquisition Agreement").) The Acquisition Agreement is governed by Nevada law. (Acquisition Agreement § 25(e), at 32.)

In the Acquisition Agreement, the South Edge Members agreed to purchase from

---

[4] Plaintiff indicates that it has not filed claims against either Kimball Hill Inc. or its subsidiary, Kimball Hill Homes, because these entities filed for bankruptcy prior to the commencement of the New York and Nevada Actions. (NV Compl. ¶ 11 n.1.)

3

South Edge portions of the Inspirada development, which were referred to as "Pods," according to a "Takedown Schedule" described in the agreement. (*See* NY Compl. ¶¶ 13-14, 17; Acquisition Agreement Exs. B, C.) After purchasing a Pod, the South Edge Members were permitted to either develop it in connection with the "Inspirada Master Plan" or resell the land to a third party. (NY Compl. ¶ 13.)

3. The Credit Agreements and Completion Guarantees

On November 1, 2004, Plaintiff and the Lenders executed a Credit Agreement with South Edge in which they agreed to loan South Edge up to $535 million. (Juman Decl. Ex. 3 (the "Credit Agreement").) In connection with the Credit Agreement, the South Edge Members and their Parents executed a Completion Guarantee regarding the project. (*Id.* Ex. 3(E) (the "Completion Guarantee").)

The Credit Agreement was amended by a March 9, 2007 Amended and Restated Credit Agreement. (*Id.* Ex. 1(A) (the "Amended Credit Agreement").) In connection with the Amended Credit Agreement, the parties also executed a Consent and Agreement that modified the Completion Guarantee. (*Id.* Ex. 1(C) (the "Consent and Agreement").)[5]

---

[5] For the purposes of resolving Defendants' motion, there are only immaterial difference between the Credit Agreement and the Completion Guarantee and the respective amended versions of those documents. Accordingly, the Court refers to each document and its corresponding amended version collectively as the "Credit Agreements" and the "Completion Guarantees."

The parties agreed that each of these agreements was to be governed by New York State law. (Credit Agreement § 11.09(a); Completion Guarantee § 17; Amended Credit Agreement § 11.09(a); Consent and Agreement § 7.) The Completion Guarantee further states that: "THE GUARANTOR CONSENTS TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN THE CITY OF NEW YORK." (Completion Guarantee § 17, at 7 (the "Forum Selection Clause") (emphasis in original).) The Credit Agreements contain a similar provision regarding "nonexclusive" jurisdiction in the courts of New York County and the Southern District of New York. (*See* Amended Credit Agreement § 11.09(b), at 99; Credit Agreement § 11.09(b), at 107 (identical provision).)

4. The Development Plan for Inspirada

The Credit Agreements include a series of specifications and scheduling milestones for South Edge's development of Inspirada. (NY Compl. ¶ 20.) The Credit Agreements set forth circumstances — including the failure to develop the project as planned or make timely loan payments — in which South Edge may be deemed to have defaulted under the agreements. (*See id.* ¶¶ 17, 20-21.) In the event a default is declared, the Completion Guarantees require the South Edge Members and their Parents to undertake South Edge's obligations in connection with the financing and development of Inspirada. (*Id.* ¶ 23.)

Under the terms of the Credit Agreements, Plaintiff and the Lenders possess liens on the deeds to the Pods in the Inspirada development. (*See id.* ¶ 17.) The Takedown Schedule in the Acquisition Agreement

4

requires the South Edge Members to purchase Pods on dates that coincide with the loan repayment schedule set forth in the Credit Agreements. (*Id.*) The agreements are structured such that a portion of the proceeds from South Edge's sale of each Pod to a South Edge Member is to be used to make a loan repayment. (*Id.*; NV Compl. ¶¶ 15-17.) When Plaintiff receives a scheduled loan payment from South Edge, it is to release the lien on the Pod in question so that the relevant South Edge Member may assume full title to it. (NY Compl. ¶ 17.)

### 5. Plaintiff's Claims

In both the Nevada and New York Actions, Plaintiff asserts that work on Inspirada has stopped and that South Edge has defaulted on its obligations under the Credit Agreements. (*Id.* ¶ 39; *see also* NV Compl. ¶¶ 33, 34.) South Edge's alleged defaults include the failure to make timely loan repayments, to "diligently continue and complete the construction" of Inspirada, and to pay certain administrative costs associated with the development of the project. (NY Compl. ¶¶ 38, 46.)

In the New York Actions, Plaintiff brings claims on behalf of the Lenders for which it acts as an administrative agent. (*See id.* ¶ 1.) Plaintiff asserts that Defendants' obligations under the Completion Guarantees have been triggered by South Edge's alleged defaults, and that Defendants have breached the Completion Guarantees. (*Id.* ¶¶ 46, 49, 56.)

In the Nevada Actions, Plaintiff seeks to bring claims against Defendants on behalf of South Edge. (NV Compl. ¶ 12.) Plaintiff asserts that, "[a]s a result of the breaches of the Credit Agreement . . . and other Loan Documents . . . , Plaintiff is entitled to enforce rights to the collateral pledged as security for the loans to South Edge." (*Id.*; *see also id.* ¶¶ 27-28.)

Plaintiff alleges in the Nevada Actions that Defendants have "interfered with [South Edge's] and Plaintiff's rights" under the Acquisition Agreement and the Operating Agreement by "failing and refusing to permit and enable" the South Edge Members to "honor [their] obligations to complete land purchases" as described in the Acquisition Agreements. (*Id.* ¶ 36.) Based on these allegations, Plaintiff brings claims for breach of contract, breach of fiduciary duty, and intentional interference with contractual relations. (*Id.* ¶¶ 42-59.)

### B. Procedural History

On December 5, 2008, Plaintiff commenced both the New York Actions and the Nevada Actions. On February 12, 2009, the Moving Defendants filed their consolidated motion to transfer the actions in which they were named as parties to the District of Nevada ("Defs.' Mem."). Plaintiff filed its opposition to Defendants' motion on February 27, 2009 ("Pl.'s Mem."), and Defendants submitted a reply on March 13, 2009 ("Defs.' Reply").

By letter dated May 8, 2009, two Non-Moving Defendants, those in *JP Morgan Chase Bank, N.A. v. Focus Group South, LLC & John A. Ritter*, No. 08 Civ. 10573 (RJS), joined Plaintiff's opposition to the motion and adopted the arguments made in Plaintiff's February 27, 2009 submission.

## II. Discussion

Congress has granted federal district courts broad discretion to transfer actions pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below, the Court concludes that the interests of justice and judicial economy are best served by transferring the six above-captioned New York Actions to the District of Nevada so that Plaintiff's related claims may be resolved in a single litigation. Accordingly, Defendants' motion is granted.

### A. Applicable Law

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "Motions for transfer lie within the broad discretion of the district court, and the court is to exercise that discretion with reference to notions of convenience and fairness on a case-by-case basis." *Fed. Ins. Co. v. Custom Expedite LLC*, No. 08 Civ. 6149 (RJS), 2009 WL 508393, at *1 (S.D.N.Y. Feb. 24, 2009) (citing *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006)). The moving party bears the burden of demonstrating that the action should be transferred. *See D.H. Blair*, 462 F.3d at 106.

In considering a § 1404(a) motion, a court must first consider whether the case could have been brought in the proposed transferee district. *Reliance Ins. Co. v. Six Star, Inc.*, 155 F. Supp. 2d 49, 56 (S.D.N.Y. 2001). If so, the Court must then determine whether transfer is appropriate. *D.H. Blair*, 462 F.3d at 106. Some of the considerations that are relevant to the Court's exercise of discretion under § 1404(a) are:

> (1) the convenience of witnesses; (2) the convenience of parties; (3) the location of relevant documents and the ease of access to those sources of proof; (4) the situs of the operative events at issue; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) judicial economy and the interests of justice.

*Kreinberg v. Dow Chem. Co.*, 496 F. Supp. 2d 329, 330 (S.D.N.Y. 2007). "No individual factor is determinative, and 'the Court has discretion to weigh the factors to reach an equitable result . . . .'" *KPMG Consulting, Inc. v. LSQ II, LLC*, No. 01 Civ. 11422 (SAS), 2002 WL 1543907, at *3 (S.D.N.Y. July 12, 2002) (quoting *Pharm. Res., Inc. v. Alpharma USPD Inc.*, No. 02 Civ. 1015 (LMM), 2002 WL 987299, at *5 (S.D.N.Y. May 13, 2002)).

### B. Analysis

There is no dispute that Plaintiff could have brought the New York Actions in Nevada and litigated them along with the seven related Nevada Actions that it commenced with identical parties on the same day. Thus, the issue before the Court is whether Defendants have met their burden of demonstrating that transfer is appropriate under § 1404(a).

Although numerous considerations are relevant to this inquiry, the text of § 1404(a)

6

provides a framework for the Court's analysis. Specifically, the statute articulates three general issues that should be considered: (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice. *See* 28 U.S.C. § 1404(a). Applying this framework, the Court concludes that the interests of justice and judicial economy counsel strongly in favor of transferring the New York Actions to the District of Nevada.

### 1. Convenience of the Parties

Plaintiff places significant reliance on the Forum Selection Clause in its opposition to Defendants' motion. (*See* Pl.'s Mem. at 5-7.) When considering the convenience of the parties, "the presence of a forum selection clause [is] a 'significant factor that figures centrally in the district court's calculus.'" *KPMG Consulting*, 2002 WL 1543907, at *3 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). Therefore, the Court begins its analysis of the parties' convenience by examining the Forum Selection Clause.

"New York law makes a clear distinction between permissive forum-selection clauses and mandatory clauses . . . ." *Orix Credit Alliance, Inc. v. Mid-South Materials Corp.*, 816 F. Supp. 230, 233 (S.D.N.Y. 1993). The Forum Selection Clause states that the South Edge Members and their Parents "CONSENT[] TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN THE CITY OF NEW YORK." (Forum Selection Clause (emphasis in original).) Consequently, the operative agreements do "not establish New York as the exclusive forum for litigation, but rather as a permissible forum, leaving the action subject to transfer." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Frasch*, 751 F. Supp. 1075, 1079 (S.D.N.Y. 1990); *cf. John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distribs., Inc.*, 22 F.3d 51, 53 (2d Cir. 1994) ("[A]n agreement *conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction elsewhere unless it contains specific language of exclusion . . . ." (quoting *City of New York v. Pullman, Inc.*, 477 F. Supp. 438, 442 n.11 (S.D.N.Y. 1979) (Weinfeld, J.) (emphasis in original))). Therefore, the Moving Defendants do no violence to their contractual obligations under the Forum Selection Clause by seeking a transfer of venue.

In an attempt to emphasize the effect of the Forum Selection Clause on the § 1404(a) analysis, Plaintiff asserts that it was "induce[d]" to enter the Credit Agreements and Completion Guarantees by "the bargain these sophisticated defendants knowingly struck." (Pl.'s Mem. at 1.) However, Plaintiff provides no reason to doubt that it could have bargained for a mandatory forum-selection clause if it deemed such a provision to be integral to the transaction. Indeed, Plaintiff is likewise a sophisticated party, and it "'should expect that the use of permissive forum selection clauses may result in distant litigation where the opposing party would be greatly inconvenienced by litigation in New York,' and where enforcement would result in a waste of resources . . . ." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Chua*, No. 90 Civ. 7491 (LLS), 1991 WL 60385 (S.D.N.Y. Apr. 4, 1991) (quoting *Leasing Serv. Corp. v. Patterson Enter., Ltd.*, 633 F. Supp. 282, 285 (S.D.N.Y. 1986)). In considering the impact of the sought-after transfer on the convenience of the parties, the Court affords Plaintiff the benefit of the

bargain it struck in the Forum Selection Clause — no more, and no less.

Based on these considerations relating to the Forum Selection Clause, the Court declines to credit Defendants' claims of inconvenience to the extent they are based solely on their respective locations. *See, e.g.*, *Orix Credit Alliance*, 816 F. Supp. at 234 ("[A]lthough a permissive forum clause is entitled to less weight than a mandatory one, the fact that both parties initially accepted the jurisdiction of the courts of New York must count."). This is true despite the fact that no Defendant is located in New York, and none of Defendants' potential employee witnesses reside in this District. (*See* Defs.' Mem. at 20 n.11 (citing declarations).) The Forum Selection Clause contemplates that, absent countervailing considerations, this District is a convenient forum for litigation. Therefore, Defendants' locations, of which they were presumably aware at the time the agreements were executed, would not ordinarily justify a transfer.

Nevertheless, there *are* countervailing considerations at play — namely, Plaintiff's overall litigation strategy — that take these actions out of the realm of the ordinary. Put simply, it is undoubtedly inconvenient for Defendants to litigate against the same adversary at the same time in separate-but-related actions on opposite sides of the nation. *See, e.g.*, *Capital Venture Int'l v. Network Commerce, Inc.*, No. 01 Civ. 4390 (JSM), 2002 WL 417246, at *2 (S.D.N.Y. Mar. 15, 2002) (noting that "[t]here is a strong policy favoring the litigation of related claims in the same tribunal" because, among other things, it avoids wasted "time and expense for both parties" (internal quotation omitted)); *Orix Credit Alliance, Inc. v. Quail Hollow Min. Co., Inc.*, No. 89 Civ. 4203 (KMW), 1991 WL 12414, at *2 (S.D.N.Y. Jan. 24, 1991) ("[T]he convenience of all of the parties are better served by litigating all of these closely related claims in a single action."). Thus, Plaintiff's initiation of the seven separate actions in the District of Nevada undercuts any argument that it would be inconvenienced by a transfer. In light of this strategy, it cannot be said that considerations of the parties' convenience favor Plaintiff in its opposition to Defendants' motion.

2. Convenience of the Witnesses

The Court must next consider the convenience of the potential witnesses in the New York Actions. Needless to say, the Forum Selection Clause negotiated and executed by the parties is irrelevant to this issue. *See Stewart Org.*, 487 U.S. at 30 ("Section 1404(a) directs a district court to take account of factors other than those that bear solely on the parties' private ordering of their affairs."). For the reasons stated below, the Court concludes that this factor favors Defendants to a limited degree.

"A party seeking to transfer based on the convenience of the witnesses must provide the court with a list of probable witnesses who will be inconvenienced by the current forum and a general statement of what the witnesses' testimony will cover in order for the moving party to meet its burden of proof." *Wechsler v. Macke Int'l Trade, Inc.*, No. 99 Civ. 5725 (AGS), 1999 WL 1261251, at *6 (S.D.N.Y. Dec. 27, 1999). Defendants have identified at least fourteen non-party witnesses who are residents of Nevada, which suggests that a transfer of venue would be appropriate. For example, Defendants argue that seven Nevada-based engineers and consultants will

8

provide "relevant information regarding construction costs, budgets, schedules, and approved plans and specifications." (Defs.' Mem. at 19 (citing declarations).) Similarly, Defendants cite seven additional witnesses from the city of Henderson, Nevada who will ostensibly testify regarding "relevant information regarding construction costs and schedules." (*Id.*)

To demonstrate that transfer is appropriate, however, Defendants must do more than offer a list of every conceivable potential witness. Based on these representations, it appears that the testimony of at least some of these witnesses would be redundant. The court is also unable to evaluate the materiality of these proposed witnesses' testimony based on Defendants' declarations. *See, e.g.*, *NBA Props., Inc. v. Salvino, Inc.*, 2000 WL 323257, at *3 (S.D.N.Y. Mar. 27, 2000) ("Defendant may not artificially inflate the number of witnesses to be inconvenienced absent transfer by listing witnesses whose testimony is not material."). Thus, while Defendants have established that the majority of the potential non-party witnesses in the New York Actions are located in Nevada, the Court is unable to approximate the number of actual potential witnesses who would be inconvenienced if Defendants' motion is denied.

In this regard, the Court also notes that Defendants have not explained with any specificity how or why these witnesses would be inconvenienced in the absence of a transfer. *See, e.g.*, *Reliance Ins. Co.*, 155 F. Supp. 2d at 58-59. Contrary to Defendants' argument, even "the unavailability of process over third-party witnesses does not compel transfer when the practical alternative of offering videotaped or deposition testimony of a given witness exists." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000). Defendants provide no reason to believe that these practical alternatives are unavailable. Accordingly, although Defendants' submissions suggest that concerns for the non-party witnesses' convenience favor transfer, the Court credits this factor only to a limited extent based on the vague nature of Defendants' representations.

### 3. Interests of Justice

The third category of considerations — the interests of justice — relates to "'public interests that must be weighed by the district court; they cannot be automatically outweighed by the existence of a purely private agreement between the parties.'" *Capital Venture Int'l*, 2002 WL 417246, at *1 (quoting *Orix Credit Alliance, Inc. v. Paul*, No. 91 Civ. 6893 (CSH), 1994 WL 75024, at *1 (S.D.N.Y. Mar. 4, 1994)). Rather, "[t]he interest of justice is a broad concept which requires the court to consider the totality of the circumstances presented," including "the interest of judicial economy." *Id.* at *1-2. Taking this factor into consideration, the Court concludes that the pendency of the Nevada Actions strongly favors granting Defendants' motion.

"It is well established that the existence of a related action pending in the transferee court weighs heavily towards transfer." *APA Excelsior III L.P. v. Premiere Techs.*, 49 F. Supp. 2d 664, 668 (S.D.N.Y. 1999). "Transfer is particularly appropriate where there is a pending lawsuit in the transferee district involving the same facts, transactions, or occurrences." *Nieves v. Am. Airlines*, 700 F. Supp. 769, 773 (S.D.N.Y. 1988); *see also*

*Savin v. CSX Corp.*, 657 F. Supp. 1210, 1214 (S.D.N.Y. 1987); *Somerville v. Major Exploration, Inc.*, 576 F. Supp. 902, 908 (S.D.N.Y. 1983). Although the Nevada Actions are not *identical* to the New York Actions, these actions are sufficiently *related* to justify a transfer of venue in the interests of justice and judicial economy.

"[T]he overwhelming reality is that absent transfer of these actions, there will be two litigations in different fora involving the same parties and issues." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 743 F. Supp. 260, 264 (S.D.N.Y. 1990). In addition to involving the same parties, both sets of cases relate to Inspirada and the parties' performance under the various agreements that were executed during the planning of the project. In the New York Actions, Plaintiff asserts that South Edge is in default under the Credit Agreement, and it alleges that Defendants have breached the Completion Guarantees. (*See, e.g.*, NY Compl. ¶¶ 46, 49, 53, 56.) In the Nevada Actions, Plaintiff likewise alleges that South Edge has defaulted, but it seeks to enforce the rights of South Edge against Defendants under, *inter alia*, the Credit Agreements, the Operating Agreement, and the Acquisition Agreement. (*See, e.g.*, NV Compl. ¶¶ 27, 32-34.)

Thus, the facts and circumstances surrounding South Edge's alleged defaults under the Credit Agreements are central to both the New York and Nevada Actions. Equally integral to these actions will be the facts regarding Defendants' conduct in forming South Edge, executing the Completion Guarantees, and developing Inspirada. Contrary to Plaintiff's assertions, conducting separate, parallel discovery regarding these issues before two federal district courts would unquestionably be duplicative and a waste of judicial resources.

In addition to the related nature of the New York and Nevada Actions, "the location of operative events is a 'primary factor' in determining a motion to transfer venue." *ZPC 2000, Inc. v. SCA Group*, 86 F. Supp. 2d 274, 279 (S.D.N.Y. 2000) (quoting *Smart v. Goord*, 21 F. Supp. 2d 309, 316 (S.D.N.Y. 1998)). The majority of the relevant events occurred in the District of Nevada. South Edge and it is general manager, Holdings Manager, are both Nevada entities. (McGibney Decl. ¶ 7.) Employees of Holdings Manager performed administrative tasks for South Edge in Nevada. (*Id.*) Holdings Manager also held weekly meetings in Las Vegas for South Edge stakeholders — including all of the South Edge Members, as well as other consultants and engineers — to discuss South Edge's operations, construction projects, and marketing efforts. (*Id.* ¶¶ 10, 13, 16.) Moreover, all of the South Edge Members have offices in Nevada, and three of the five South Edge Members that are Moving Defendants are organized under the laws of Nevada. (McGibney Decl. ¶ 6; Cooper Decl. ¶ 1; Allred Decl. ¶ 1; Stocks Decl. ¶ 3.)

It would be more efficient to litigate these claims in the District in which they occurred, alongside the seven related Nevada Actions that Plaintiff has chosen to separately commence. Indeed, "when the operative facts have few meaningful connections to the plaintiff's chosen forum. . . . [t]he importance of the plaintiff's choice of forum measurably diminishes." *Kreinberg*, 496 F. Supp. 2d at 330 (citing *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 659 (S.D.N.Y. 1998)); *see also ZPC 2000*, 86 F. Supp. 2d at 280 (citing *Wechsler*, 1999 WL 1261251, at *4). Thus,

Plaintiff's choice of forum cannot outweigh the interests of justice and judicial economy under § 1404(a).[6]

In conclusion, where, as here, "'there is no material connection between this district and the operative facts . . . the interests of justice *require* the transfer of the action.'" *Cohn v. Metro. Life Ins., Co.*, No. 07 Civ. 928 (HB), 2007 WL 1573874, at *3 (S.D.N.Y. May 31, 2007) (quoting *Weschler v. Macke Int'l Trade, Inc.*, No. 99 Civ. 5725 (AGS), 1999 WL 1261251, at *10 (S.D.N.Y. Dec. 27, 1999)) (emphasis added). Accordingly, based on the interests of justice and judicial economy, the Moving Defendants' motion is granted as to the five actions in which they are parties.

### C. The Non-Moving Defendants

"It is well established that a district court can order a transfer *sua sponte*, provided that court give notice to the parties of its intention to do so in order that the parties may respond." *Angelov v. Wilshire Bancorp*, No. 06 Civ. 4223 (CM), 2007 WL 2375131, at *3 (S.D.N.Y. Aug. 14, 2007); *Wightman-Cervantes v. ACLU*, No. 06 Civ. 4708 (DC), 2007 WL 1805483, at *2 (S.D.N.Y. June 25, 2007) (citing *Lead Indus. Assoc. v. OSHA*, 610 F.2d 70, 79 n.17 (2d Cir. 1979)). Non-Moving Defendants in *JP Morgan Chase Bank, N.A. v. Focus Group South, LLC & John A. Ritter*, No. 08 Civ. 10573 (RJS), have joined Plaintiff's opposition to a transfer of venue. Thus, these Defendants have had notice of the potential for a transfer of venue, and have taken a position before the Court regarding the Moving Defendants' motion. For the reasons set forth herein, and because five of the related New York Actions will now be transferred, the Court concludes that this matter should be transferred to the District of Nevada as well.

Nevertheless, because the parties in *JP Morgan Chase Bank, N.A. v. Alameda Investments LLC*, No. 08 Civ. 10570 (RJS) have *not* submitted papers taking a position on the existing transfer motions, and because it is at least conceivable that Alameda Investments LLC lacks notice of the possible transfer of venue, the parties are hereby ordered to show cause in writing, by June 5, 2009, why these matters should not be transferred to the District of Nevada pursuant to 28 U.S.C. § 1404(a) based on the interests of justice and judicial economy described in this Memorandum and Order. The parties' submissions shall not exceed five single-spaced pages, and failure to meet the Court's deadline will be deemed a waiver of any opposition to the transfer of the case to the District of Nevada with the other New York Actions.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for a transfer of venue is granted. The

---

[6] The Court also disagrees with Plaintiff's contention that "familiarity with New York law supports enforcement of the forum selection clauses." (Pl.'s Mem. at 24.) "[T]he possibility that the law of another jurisdiction governs is a factor accorded little weight on a motion to transfer, especially where no complex questions of foreign law are involved." *Federman Assocs. v. Paradigm Med. Indus*, No. 96 Civ. 8545 (BSJ), 1997 WL 811539, at *4 (S.D.N.Y. Apr. 8, 1997). Regardless of the complexity of the underlying transaction, Plaintiff's claims sound in basic legal principles of contract and tort. The Court is supremely confident that courts in the District of Nevada will have no difficulty applying New York law relating to these principles.

Clerk of the Court is respectfully directed to transfer to the District of Nevada the cases docketed as Nos. 08 Civ. 10571 (RJS), 08 Civ. 10572 (RJS), 08 Civ. 10573 (RJS), 08 Civ. 10574 (RJS), 08 Civ. 10582 (RJS), and 08 Civ. 10583 (RJS).

SO ORDERED.

/s/ Richard J. Sullivan
RICHARD J. SULLIVAN
United States District Judge

\* \* \*

Dated: May 26, 2009
       New York, New York

Plaintiff is represented by Jamie A. Levitt and Leah Andrea Ramos, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104. Defendants Coleman-Toll Limited Partnership and Toll Brothers, Inc. are represented by Benjamin D. Lichtman, Mark T. Drooks, and Scott M. Himes, Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, 1875 Century Park East, 23rd Floor, Los Angeles, California 90815. Defendants KB Home and KB Home Nevada, Inc. are represented by Erica Taggart, Bruce E. Van Dalsem, Johanna Ong, Robert Craig Juman, Quinn Emanuel Urquhart Oliver & Hedges LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010. Defendants Pardee Homes of Nevada and Weyerhaeuser Real Estate Company are represented by Kristin Marie Jamberdino, Nixon Peabody LLP, 437 Madison Avenue, New York, New York 10022. Defendants Meritage Homes of Nevada, Inc. and Meritage Homes Corp. are represented by Mark S. Cohen, Oliver Scott Haker, and Sandra C. McCallion, Cohen & Gresser, LLP, 100 Park Avenue, 23rd Floor, New York, New York 10017. Defendants Beazer Homes Holding Corp. and Beazer Homes USA, Inc. are represented by Andrew Detherage, Karoline E. Jackson, and Thomas E.L. Dewey, Barnes & Thornburg LLP, 11 South Meridian Street, Indianapolis, Indiana 46204.